1

2          UNITED STATES DISTRICT COURT
              DISTRICT OF NEVADA
3

4   Christopher O. Smith,                    Case No. 2:20-cv-01108-CDS-DJA

5                      Petitioner            **Order Denying
                                             28 U.S.C. § 2254**
6        v.                                  **Amended Petition**

7   Ronald Oliver,[1] et al.,

8                      Respondents           [ECF No. 13]

9   _____

10          Petitioner Christopher O. Smith (hereinafter "Smith") has filed a counseled amended

11  petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 13. This matter is before this

12  court for adjudication of the merits of the remaining grounds[2] in the amended petition, which

13  allege a Confrontation Clause violation and ineffective assistance of trial and appellate counsel.

14  For the reasons discussed below, I deny the amended petition and a certificate of appealability.

15  **I.      Background**

16          **A.      Factual background[3]**

17          Smith's daughter, V. C.-S.,[4] testified that in April 2007, when she was fourteen years old,

18  she lived with her mother, Dawn Colver, and her mother's boyfriend, Marquell James. ECF No.

19  29-3 at 29–33. Smith and James were friends, but Smith was unaware that James and Colver were

20  dating. *Id.* at 65. On April 11, 2007, V.C.-S. got into an argument with Colver. *Id.* at 34. After V.C.-

21  S. and James dropped Colver at her workplace, V.C.-S. called Smith to pick her up because she

22  "wanted to come stay with him for a little while" following her argument with her mother. *Id.* at

23

24  _____

    [1] The state corrections department's inmate locator page states that Smith is incarcerated at Southern
25  Desert Correctional Center. Ronald Oliver is the current warden for that facility. At the end of this order, I
    direct the clerk to substitute Ronald Oliver as a respondent for Respondent Jerry Howell. *See* Fed. R. Civ.
26  P. 25(d).
    [2] I previously dismissed ground 4 in part. ECF No. 60.
27  [3] I make no credibility findings or other factual findings regarding the truth or falsity of this evidence from
    the trial at the state court. My summary is merely a backdrop to my consideration of the issues presented
28  in the amended petition.
    [4] Because V.C.-S. was a minor child, I refer to her by her initials. LR IA 6-1(a).

35–37. When James and V.C.-S. returned home, V.C.-S. called Smith again to let him know that she was ready for him to pick her up. *Id.* at 39. Because Colver did not want Smith knowing where she and V.C.-S. lived, V.C.-S. indicated that she would meet Smith "in the beginning of [their] housing complex." *Id.* at 55. However, before V.C.-S. had a chance to walk to the meeting place, Smith and his girlfriend, Stephanie Aragon, arrived at the house. *Id.* at 57. V.C.-S. got in the car, and Aragon drove the car to a stop sign about a block away before Smith unexpectedly exited the car. *Id.* at 59–60. Smith was gone for approximately 20 minutes. *Id.* at 66. When Smith returned, he was shaken up, spoke with Aragon, and then told V.C.-S. that "he had to drop [her] off somewhere." *Id.* When they got to V.C.-S.'s friend's house shortly thereafter, Smith, who was crying, gave V.C.-S. a hug and told her he was sorry. *Id.* at 67, 93.

Aragon testified that after Smith received the phone call from V.C.-S. on April 11, 2007, he was confused "why [V.C.-S.] would be running around with [James]." ECF No. 30-2 at 192–193, 199. Smith asked Aragon to drive him to his brother's house and then to his mother's house. *Id.* at 202–204. Aragon did not accompany Smith into either of these residences, but she saw a man give Smith a baseball bat while he was at his mother's house. *Id.* at 205. After putting the bat in Aragon's car, Smith told Aragon that "he thought he more or less . . . knew where [Colver] might have lived." *Id.* at 205. As Aragon and Smith were driving through a neighborhood near where V.C.-S. told them to meet her, they passed "a car parked in front of a house that looked like [Colver]'s car." *Id.* at 209. Aragon turned the car around to go back to the house, and at that point, they saw V.C.-S. walking down the driveway of the house. *Id.* at 212. After V.C.-S. got in the car, Smith left with the baseball bat. *Id.* at 212–13. Smith came back approximately 15 minutes later holding the baseball bat. *Id.* at 216–17. When Smith got in the car, "he didn't look like himself and he was mumbling . . . and you could see . . . terror." *Id.* at 217. Smith also had blood on his shirt, was shaking, and "had a busted lip" and black eye. *Id.* at 218, 228. After dropping V.C.-S. off at her friend's house, Smith asked Aragon to drive him back to his brother's house. *Id.* at 221. When they got to Smith's brother's house, Smith changed into new clothes. *Id.* at 222. While Smith was changing, Aragon saw that Smith had a black handgun, and when she asked where it

came from, Smith told her that he had gotten it from his brother. *Id.* at 223–24. Smith later threw the baseball bat in a dumpster. *Id.* at 225.

Officers responded to Colver's and James' house and received no answer when they knocked on the door. ECF No. 29-3 at 144. The officers did not see any forced entry, but because the front door was unlocked, the officers entered the house. *Id.* at 144–45. The officers found the master bedroom "tossed" and the mattress partially off the bed. *Id.* at 148. The officers then found James without a pulse lying on his back in the bathroom of the master bedroom with blood on his shirt. *Id.* at 151, 183. Dr. Timothy Dutra, a medical examiner at the Clark County Office of the Coroner, testified that he reviewed James' autopsy report conducted by Dr. Jacqueline Benjamin. ECF No. 30-2 at 62–64. Dr. Dutra testified that James had some lacerations on his face, abrasions on parts of his body, and a gunshot wound below his left collarbone. *Id.* at 68–70. The bullet passed through the right ventricle of James' heart. *Id.* at 72, 81.

**B.    Procedural background**

At trial, Smith's defense was that he and James struggled and that he accidentally shot James. *See* ECF No. 13 at 13. The jury found Smith guilty of burglary while in possession of a deadly weapon and first-degree murder with the use of a deadly weapon. ECF No. 31-4. As a result of the conviction, Smith was sentenced to 72 to 180 months on the burglary count, and 20 years to life for one count of first-degree murder, followed by a consecutive term of 20 years to life for the deadly weapon enhancement. ECF No. 32-11. Smith appealed his conviction, and the Supreme Court of Nevada affirmed on May 29, 2015. ECF No. 33-10. Remittitur issued on June 26, 2015. ECF No. 33-14.

Smith filed a pro se state petition for postconviction relief and a counseled supplemental petition on October 19, 2015, and July 16, 2018, respectively. ECF Nos. 33-18, 34-29. The state court denied Smith postconviction relief without an evidentiary hearing on March 21, 2019. ECF No. 35-2. Smith appealed, and the Supreme Court of Nevada affirmed on April 15, 2020. ECF No. 35-16. Remittitur issued on May 11, 2020. ECF No. 35-17.

Smith transmitted his pro se federal petition for postconviction relief on or about June 18, 2020. ECF No. 1-1. Smith was appointed counsel and filed his instant counseled first amended

petition on March 19, 2021. ECF Nos. 5, 13. Respondents moved to dismiss the first amended petition, and I granted the motion in part, (1) finding that grounds 2(a) and 2(b) were technically exhausted but procedurally defaulted and (2) dismissing ground 4 to the extent it incorporated grounds 2(a) and 2(b). ECF Nos. 42, 60. Respondents filed their answer to Smith's amended petition on January 1, 2023. ECF No. 74. Smith filed his reply on October 25, 2023. ECF No. 90.

## II.      Governing Standard of Review

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

1   The Supreme Court has instructed that "[a] state court's determination that a claim

2   lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

3   correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing

4   *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a

5   strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at

6   102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing

7   the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court

8   rulings, which demands that state-court decisions be given the benefit of the doubt" (internal

9   quotation marks and citations omitted)).

10   **III.     Discussion**

11       **A.     Ground 1—Confrontation Clause**

12   In ground 1, Smith alleges that he was denied his constitutional right to confront

13   witnesses as guaranteed by the Sixth and Fourteenth Amendments. ECF No. 13 at 8.

14           *1.     Background information*

15   Prior to Dr. Dutra's testimony, outside the presence of the jury, Smith's counsel informed

16   the trial court that Dr. Benjamin, who performed James' autopsy, was no longer employed by the

17   Clark County Medical Examiner's Office and that the prosecutor had filed notices of various

18   expert witnesses, indicating that the State would be having a different doctor from the medical

19   examiner's office testify in her place. ECF No. 30-2 at 33–34. Smith's counsel objected to this

20   testimony "under the 6th Amendment right to confront witnesses, the right to cross-examine

21   witnesses and a violation of our due process rights to confront the witnesses against us through

22   the use of testimonial hearsay both under *Crawford* and the U.S. Constitution." *Id.* at 34. The trial

23   court overruled the objection, noting that it did not believe that *Crawford* was intended to

24   "prevent the State from going forward" on a case if they did not "have a[n original] coroner

25   because they passed away, . . . have dementia, something where they can't testify or they just can't

26   be located." *Id.* at 56.

27   Dr. Dutra then testified, *inter alia*, to the following: (1) he reviewed Dr. Benjamin's

28   autopsy report, Dr. Benjamin's grand jury testimony, and photographs of the autopsy, (2) he did

not view James' t-shirt, (3) from his review of the autopsy report and photographs, James suffered from lacerations, abrasions, and a gunshot wound, (4) the lacerations and abrasions "were near in time to the death," (5) from his review of the x-rays taken, the bullet's trajectory "was downward, backward and slightly leftward," (6) examining the clothing the decedent was wearing "is relevant if the . . . bullet passed through the clothing prior to entering the body" because soot and stippling come out of the gun's muzzle and do not pass through clothing, (7) his training in forensic pathology taught him to recognize soot and stippling which are used "as a way of assessing the range of the . . . gunshot," (8) there was no stippling in this case, (9) looking at a photograph of James' shirt, he did not see soot, so it was his conclusion that this was "a distance-range shot," and (10) he agrees with Dr. Benjamin, who did a visual inspection of the t-shirt at some point during the autopsy, "that the firearm was at least one foot away from the body" at the time it was shot. ECF No. 30-2 at 64–75, 78–79, 82, 91. Notably, in the pathologic diagnosis portion of her autopsy report, Dr. Benjamin listed the following: "[d]istant range gunshot wound" and "no soot or stippling on clothing or skin." ECF No. 17-1 at 2. Dr. Benjamin also stated in her report that (1) "[t]here is no soot, stippling or unburnt gunpowder particles visible on the skin surrounding the wound," and (2) "[e]xamination of the gray outer T-shirt and white [inner] T-shirt reveals blood, predominately on the left side of the clothing[, t]here does not appear to be any soot or gunpowder particles on the T-shirts." *Id.* at 5, 6.

### 2. *Legal standard*

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. State of Ala.*, 380 U.S. 415, 418 (1965); *see also Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose . . . infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."); *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.").

The United States Supreme Court has determined that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). The United States Supreme Court has also held that "analysts' affidavits [are] testimonial statements," so "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) (emphasis in original) (internal quotation marks omitted). Thereafter, the United States Supreme Court held that the Confrontation Clause does not allow the government "to introduce a forensic laboratory report containing a testimonial certification . . . through the in-court testimony of a scientist who did not . . . perform or observe the test reported in the certification . . . unless the analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine the particular scientist." *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011) (holding that a blood alcohol analysis report was testimonial). Importantly, Justice Sotomayor, who provided the fifth vote for the majority in *Bullcoming*, identified, in her separate opinion, a Confrontation Clause question that remained unanswered: the degree of proximity the testifying witness must have to the scientific test, explaining "this is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* at 672 (Sotomayor, J., concurring in part). Later, in *Williams v. Illinois*, five Justices agreed that the admission of expert testimony referring to an out-of-court DNA profile did not violate the Confrontation Clause. 567 U.S. 50 (2012). And as Justice Breyer acknowledged in his concurrence, the Court did not settle how "Confrontation Clause 'testimonial statement' requirements apply to crime laboratory reports." *Id.* at 92 (Breyer, J., concurring).

### 3.   *State court determination*

In affirming Smith's judgment of conviction, the Supreme Court of Nevada held:

> Smith contends that the district court erred by allowing Dr. Dutra to testify in place of the original medical examiner in violation of his right to confront and cross examine witnesses against him.
> [FN2] Dr. Dutra did not conduct a separate autopsy.

7

He further contends that because the State used Dr. Dutra's testimony regarding the absence of soot and stippling

> [FN3] Soot and stippling are substances that result from the firing of a gun and they do not pass through clothing. They are caught on clothing when the gun is fired at close range.

on James' clothes to argue that the killing was committed from a distance and therefore premeditated, he was prejudiced by his inability to controvert the soot and stippling evidence through cross examination of the original examiner. The State argues that Dr. Dutra's testimony was admissible because it was not offered to prove the truth of the original examiner's reports, but to show the bases of Dr. Dutra's opinion.

We generally review claims of evidentiary error for an abuse of discretion. *Holmes v. State*, 129 Nev., Adv. Op. 59, 306 P.3d 415, 418 (2013) (internal citation omitted). However, this court has determined that, where a *Crawford* violation occurs, harmless error review is appropriate.

> [FN4] "Under *Crawford*, the testimonial statement of an otherwise unavailable witness is inadmissible "unless the defendant had an opportunity to previously cross-examine the witness regarding the witness's statement." *Polk v. State*, 126 Nev., Adv. Op. 19, 233 P.3d 357, 359 (2010) (internal quotations omitted).

*Polk v. State*, 126 Nev. Adv. Op. 19, 233 P.3d 357, 359 (2010). A doctor's testimony regarding his or her independent opinions based on a report generated by another doctor does not violate the confrontation clause because the testifying doctor's "judgment, proficiency, and methodology [are] subject to cross-examination." *Vega v. State*, 126 Nev. 332, 340, 236 P.3d 632, 638 (2010) (holding that testimony relating to the content of such reports may violate the confrontation clause, but testimony regarding the testifier's independent opinions does not). Because Dr. Dutra's testimony related to his own opinions, for which he was available for cross examination, Smith's confrontation right was not violated. *See id.* To the extent that testimony regarding the content of the autopsy report was admitted, we hold such error to be harmless. *See id.*

ECF No. 14-14 at 6–7.

### 4.   Analysis

The Supreme Court of Nevada reasonably determined that Smith's Confrontation Clause rights were not violated by certain portions of Dr. Dutra's testimony. As the Supreme Court of Nevada reasonably concluded, a portion of Dr. Dutra's testimony related to his own opinions. Indeed, Dr. Dutra testified that his conclusion that there was no soot on James' shirt came from *his own* review of the autopsy photographs of the shirt. As such, because Dr. Dutra was available for cross-examination on this issue, Smith's confrontation rights were not violated. *See Flournoy v. Small*, 681 F.3d 1000, 1001-02 (9th Cir. 2012) ("[T]here was no clearly established federal law, based on decisions of the United States Supreme Court, that held [a forensic analyst's] testimony to violate the Confrontation Clause in circumstances where the testifying witness participated in and reviewed the crime lab's work, even though she did not personally conduct all the testing

herself."). And regarding Dr. Dutra's testimony about Dr. Benjamin's findings from her autopsy report, the testimonial nature of an autopsy report has not been specifically evaluated by the Supreme Court. *See Meras v. Sisto*, 676 F.3d 1184 (9th Cir. 2012) (explaining that *Crawford* did not clearly establish that autopsy reports are testimonial).

Contrarily, Dr. Dutra's testimony that he agreed with Dr. Benjamin "that the firearm was at least one foot away from the body" at the time it was shot differs from the above scenarios because it pertained to Dr. Benjamin's grand jury testimony rather than Dr. Dutra's own observations or Dr. Benjamin's autopsy report. However, as the Supreme Court of Nevada reasonably determined, to the extent that Smith's confrontation rights were violated, any error was harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (holding that Confrontation Clause errors are subject to harmless-error analysis); *see also McNeiece v. Lattimore*, 501 Fed. App'x. 634, 636 (9th Cir. 2012) (citing *Flournoy*, 681 F.3d at 1004–05 (state appellate court's determination that the trial court admitting testimony from a pathologist who had not conducted the autopsy was not a violation of the Confrontation Clause or an unreasonable application of clearly established federal law.).

The harmless-error inquiry "is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. Here, the introduction of Dr. Benjamin's grand jury testimony "that the firearm was at least one foot away from the body" was harmless beyond a reasonable doubt given that this testimony merely quantified in layman's terms Dr. Benjamin's scientific statement in her autopsy report that James suffered from a "[d]istant range gunshot wound." ECF No. 17-1 at 2.

Accordingly, the Supreme Court of Nevada's determination that Smith was not entitled to relief based on a Confrontation Clause violation was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Smith is not entitled to federal habeas relief for ground 1.

### B. Ground 2—assistance of trial counsel

In ground 2, Smith alleges that he was deprived of the effective assistance of trial counsel as guaranteed by the Sixth and Fourteenth Amendments. ECF No. 13 at 15.

#### 1. *Legal standard*

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's Strickland determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 2.   Ground 2(a)—investigate and present expert testimony.

In ground 2(a), Smith alleges that his trial counsel was ineffective for failing to investigate and present expert testimony rebutting Dr. Dutra's testimony. ECF No. 13 at 16.

#### a.   Procedural default

I previously determined that ground 2(a) was technically exhausted because it would be procedurally barred in the state courts, and I deferred a decision on whether Smith can demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012) to overcome the procedural default. ECF No. 60 at 7. Now this issue is ripe for decision. The principal issues[5] are: (1) whether Smith's ineffective-assistance-of-trial-counsel claim is substantial; (2) if so, whether Smith's state postconviction counsel was ineffective in raising this claim in the state court; and (3) if so, whether, on the merits, Smith was denied effective assistance of trial counsel. *See, e.g., Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1243–46 (9th Cir. 2013). On all such issues, my review is *de novo*. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019); *Atwood*, 870 F.3d at 1060 n.22.

#### b.   Investigatory duties

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* This investigatory duty includes investigating the defendant's most important defense and investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999); *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994). In assessing counsel's investigation, the court must conduct an objective review of counsel's performance, measured for "reasonableness under prevailing professional norms."

---

[5] It has not been disputed herein (1) that a state postconviction proceeding in the state court was an initial-review collateral proceeding for purposes of *Martinez*, or (2) that Nevada procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the *Martinez* rule. *See generally Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

*Strickland*, 466 U.S. at 688. This includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Id.* at 689; *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Furthermore, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

### c.   Background information

Smith argues that his trial counsel should have investigated and presented expert testimony to rebut Dr. Dutra's testimony regarding the absence of firearm discharge residue and its implications regarding the distance at which James was shot. In support of this argument, Smith presents a forensic report from Microtrace LLC. ECF No. 15-11. In that forensic report, Christopher S. Palenik, Ph.D. and Jack Hietpas, Ph.D explained, *inter alia*, the following:

The identification of firearm discharge residues and distance determinations by a medical examiner is arguably outside of their area of expertise. In a case such as this, where various complexities further complicate this determination (e.g., a dark colored shirt, excessive blood in the area of the bullet hole), a conclusion as to whether or not firearm discharge residues are present on clothing requires laboratory analysis and falls well outside the scope of a medical examiner's capabilities, particularly when Dr. Dutra agrees that he can only do part of the testing required to see firearm discharge residues. Attempts for a medical examiner to draw such conclusions through the use of the t-shirt photographs is a further stretch. Therefore, conclusions drawn by Dr. Dutra on this topic cannot be considered sufficient to support the conclusions he has drawn related to firearms residues and muzzle-to-target distance determination.

*Id.* at 7.

### d.   Analysis

Respondents argue that this court is prevented from considering Microtrace LLC's forensic report. ECF Nos. 74 at 12. The Supreme Court has recently held that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel" unless the prisoner can satisfy 28 U.S.C. § 2254(e)(2)'s stringent requirements under AEDPA. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022). Smith contends that *Ramirez* does not foreclose consideration of Microtrace LLC's forensic report because he was not at fault for any failure to develop the factual basis of this claim during the state postconviction proceedings. ECF No. 90 at 32. Specifically, Smith asserts that he exercised diligence by presenting various claims to the state courts that addressed his trial counsel's failure to challenge Dr. Dutra and repeatedly requested that the state court hold an evidentiary hearing to expand the record on his claims. *Id.*

Smith fails to demonstrate that he meets the stringent requirements of 28 U.S.C. § 2254(e)(2). Nonetheless, I consider Microtrace LLC's forensic report because (1) the specific contours of *Ramirez* are still developing, (2) Smith is not entitled to relief even considering this new evidence, as is discussed further below, and (3) considering Microtrace LLC's forensic report at this juncture may reduce the likelihood of further litigation.

Based on the contents of Microtrace LLC's forensic report, it appears that Smith's trial counsel likely could have more vigorously challenged Dr. Dutra's testimony, potentially by way of presenting an expert witness. However, during his cross-examination of Dr. Dutra, Smith's trial counsel reasonably highlighted the limitations of Dr. Benjamins only having visually inspected James' shirt for residue and Dr. Dutra only having viewed a photograph of James' shirt for residue to determine the distance at which James was shot. *See Harrington*, 562 U.S. at 106 ("Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach."); *see also Strickland*, 466 U.S. at 688–89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."). In fact, Smith's trial counsel confirmed (1) that Dr. Dutra "did not go and get the evidence out of the evidence locker [to] look at the T-shirts involved in this case," (2) "other surfaces [had] came in[to] contact with the T-shirts" before they were visually inspected, including a "sheet [that] was actually pressed up against the T-shirt," (3) there was no written forensic reports conducted concerning the t-shirts, (4) the gunshot residue "could be either grossly visible or could be [only] microscopically visible," and (5) there was no microscopic examination of the t-shirts because "[t]hat's generally . . . in the domain of the crime laboratory." ECF No. 30-2 at 82–84, 88. Accordingly, based on this cross-examination, Smith's trial counsel's representation did not fall below an objective standard of reasonableness regarding demonstrating the unreliability of Dr. Dutra's testimony on the lack of visual residue on the shirt. Consequently, based on the record, Smith's ineffective assistance of trial counsel claim is not substantial because he fails to demonstrate deficiency under *Strickland*. Because Smith fails to

demonstrate requisite prejudice necessary to overcome the procedural default of ground 2(a), it is dismissed.

### 3.    *Ground 2(b)—object to the prosecutor's closing argument*

In ground 2(b), Smith alleges that his trial counsel was ineffective for failing to object to the prosecutor's misstatements of the felony murder rule during closing argument and the trial court's failure to instruct the jury regarding their ability to find him guilty of second-degree murder or voluntary manslaughter. ECF No. 13 at 19. Specifically, regarding Smith's former argument, he asserts that (1) the prosecutor improperly stated that, if the jury found Smith guilty of burglary, it would be obligated to find him guilty of first-degree murder and (2) the prosecutor stated that he could not claim self-defense. ECF No. 90 at 45–46.

### a.    *Procedural default*

Like with ground 2(a), I previously determined that ground 2(b) was technically exhausted because it would be procedurally barred in the state courts, and I deferred a decision on whether Smith can demonstrate cause and prejudice under *Martinez* to overcome the procedural default. ECF No. 60 at 7. And like ground 2(a), the principal issues now ripe for review are (1) whether Smith's ineffective-assistance-of-trial-counsel claim is substantial; (2) if so, whether Smith's state postconviction counsel was ineffective in raising this claim in the state court; and (3) if so, whether, on the merits, Smith was denied effective assistance of trial counsel.

### b.    *Background information*

During closing arguments, the prosecutor made the following statements:

> It's called the felony murder rule. There is a kind of murder which carries with it conclusive evidence of premeditation and malice aforethought. A killing which is committed in the perpetration or attempted perpetration of such a burglary is deemed to be murder of the first degree whether that killing is intentional, unintentional or accidental.
> The second way to get to first-degree murder, it's called felony murder. It's murder if you are going somewhere with the intent to commit or while trying to perpetrate a burglary and someone is killed. It is felony murder. You don't have to prove premeditation, no longer have to prove malice aforethought.

ECF No. 31-5 at 36. Later, the prosecutor argued:

> Now, the felony murder, ladies and gentlemen, is an exact and unbending rule of law. It is unbending. A killing which is committed in the perpetration or attempted perpetration of such a burglary is deemed to be murder of the first

degree. Here is the very unbending aspect of it, and this is the law, and you all agreed that you would apply the law.

Whether the killing was intentional or unintentional or accidental this is called the felony-murder rule. When he went into the house with the intent to assault and batter and the death occurred, that is first-degree murder. That is what the defendant committed. It wasn't self-defense. We went through that. He is the original aggressor. He brings the bat. He brings the gun. He goes all the way up into the bedroom to confront him. He's the original aggressor.

*Id.* at 80. Regarding Smith not being able to claim self-defense: the prosecutor argued (1) "[i]f you find that the defendant was in the process or attempt perpetration of a burglary, then it falls under felony murder [and] the defendant cannot claim self-defense in that particular case," and (2) "if you find that the defendant was committing a burglary, the defendant cannot claim self-defense[, t]hat's tied to the felony-murder rule." *Id.* at 38, 84.

Later, the trial court noted that it needed to make a record of a jury question that it received during deliberations. *Id.* at 90. The trial court indicated that the jury asked the following question, "If we find the defendant guilty of burglary with a deadly weapon, does it automatically rule out second-degree murder or voluntary manslaughter." *Id.* at 90–91. The trial court then indicated that it had a conference call with the parties "and together [they] agreed on [an] answer which was typed and then presented to the jury." *Id.* at 91. That answer provided as follows: "The jury was referred back to the instructions. The Court is not at liberty to supplement the instructions. The verdict is within the province of the jury." *Id.*

### c.   *Analysis*

Smith fails to demonstrate that his trial counsel's representation fell below an objective standard of reasonableness. First, regarding Smith's contention that the prosecutor made improper statements about burglary and the presumption of premeditation and deliberation in felony murder, the prosecutor's statements were a proper recitation of Nevada law. *See Rose v. State*, 255 P.3d 291, 295 (Nev. 2011) ("The felony-murder rule makes a killing committed in the course of certain felonies murder, without requiring the State to present additional evidence as to the defendant's mental state."); *Crawford v. State*, 121 P.3d 582, 585 (Nev. 2005) (holding that the state court properly instructed the jury on felony murder when it stated that a killing committed in the perpetration or attempted perpetration of burglary carries with it "conclusive evidence or

premeditation, deliberation and malice aforethought"); Nev. Rev. Stat. § 200.030(1)(b) (defining first-degree felony murder as a murder that is committed in the perpetration or attempted perpetration of certain enumerated crimes, including burglary). Indeed, Smith admits that "because felony murder is defined by statute as first-degree murder, no proof of the traditional factors of willfulness, premeditation, or deliberation is required." ECF No. 90 at 45 n.22. Nonetheless, Smith contends that the prosecution's statements suggested to the jury that the presumption of premeditation and deliberation applied to both first-degree murder theories rather than just to the felony-murder theory. ECF No. 90 at 47. This argument lacks traction given the jury instructions. In fact, the jury instructions provided, *inter alia*, that (1) "[a]ll three elements—willfulness, deliberation, and premeditation—must be proven beyond a reasonable doubt before an accused can be convicted of first-degree murder," (2) felony murder "is a kind of murder which carries with it conclusive evidence of premeditation and malice aforethought," (3) "[w]hen one kills in the commission of a felony, the person committing the felony cannot claim self-defense," and (4) it is the jury's "duty to be governed in [their] deliberations . . . by the law as given to you in these instructions." ECF No. 31-3 at 21, 24, 38, 45.

Second, regarding Smith's contention that the prosecutor improperly stated that he could not claim self-defense, these statements were also a proper recitation of Nevada law because they were made in relation to the prosecution's felony-murder theory rather than the prosecution's willful, deliberate, and premeditated murder theory. *See* ECF No. 31-5 at 38, 84.

Third, regarding Smith's contention that the trial court failed to instruct the jury regarding their ability to find him guilty of second-degree murder or voluntary manslaughter after they asked a question during deliberations, this contention is belied by the record. The trial court referred the jury "back to the instructions"; those instructions discussed second-degree murder and voluntary manslaughter. ECF Nos. 31-3 at 27, 31; 31-5 at 91.

In sum, Smith's ineffective assistance of trial counsel claim is not substantial because he fails to demonstrate deficiency under *Strickland*. Because Smith fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 2(b), it is dismissed.

1

     4.    *Ground 2(c)—investigate and call witnesses.*

2

     In ground 2(c), Smith alleges that his trial counsel was ineffective for failing to

3

investigate and call witnesses, including Smith's mother and brother. ECF No. 13 at 22.

4

     a.    *Background information*

5

     Prior to Smith's trial, a private defense investigator interviewed Smith's brother, Abdul

6

Vashon Smith ("Abdul"), and Smith's mother, Helen Smith ("Helen"). ECF No. 15-1 at 39–45.

7

Abdul told the investigator, *inter alia*, the following: (1) on the night of James' death, Smith had

8

gone to Abdul's house because Abdul had been sick and Smith wanted to see how he was doing,

9

(2) that night, Smith and Abdul "talked briefly at the door about someone trying to kick in

10

[their] mom's door," (3) Smith never mentioned "going anywhere else that night" or "going over

11

to [Colver]'s house to pickup his daughter," (4) Smith "didn't tell him anything about [James]

12

being at [Colver]'s house, or mention [James] at all," (5) Abdul did not give Smith any type of

13

weapon, and (6) later that night, Smith returned to his house and was crying but "did not tell

14

him why he was crying." *Id.* at 39–41. Helen told the investigator, *inter alia*, the following: (1)

15

"[s]he did not speak to [Smith] on the day in April 2007," and (2) "prior to this incident in April

16

2007 she had not seen or spoke to [Smith] for approximately 8 years." *Id.* at 44–45.

17

     b.    *State court determination*

18

     In affirming the state court's denial of Smith's state postconviction petition, the Supreme

19

Court of Nevada held:

20

     Second, Smith argues trial counsel did not present a defense. Noting that trial
counsel did not call a single witness, Smith asserts that trial counsel could have

21

presented testimony from his brother and his mother to dispute testimony that he
obtained weapons from their homes before going to the victim's home. Smith has

22

not demonstrated deficient performance or prejudice. Smith's mother and brother
were interviewed by defense investigators. The district court determined there

23

were strategic reasons not to call them as witnesses, and Smith has not
demonstrated that this conclusion was in error. *See Strickland*, 466 U.S. at 690–91

24

(noting that "strategic choices made after thorough investigation of law and facts
relevant to plausible options are virtually unchallengeable"); *Doleman v. State*, 112

25

Nev. 843, 848, 921 P.2d 278, 280–81 (1996) ("A strategy decision, such as who
should be called as a witness, is a tactical decision that is 'virtually unchallengeable

26

absent extraordinary circumstances.'" (quoting *Howard v. State*, 106 Nev. 713, 722,
800 P.2d 175, 180 (1990))). Smith has also not demonstrated a reasonable

27

probability of a different outcome if these witnesses had testified given the
substantial evidence presented at trial. Therefore, the district court did not err in

28

denying this claim without an evidentiary hearing.

ECF No. 15-8 at 5.

> ### c.   *Analysis*

Given that "[f]ew decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial," *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999), it appears that, based on the limited record on this issue, the Supreme Court of Nevada reasonably determined that Smith failed to demonstrate that his trial counsel acted deficiently by not calling his mother and brother as witnesses at the trial. However, even if Smith's trial counsel was deficient, which is not entirely clear without testimony from Smith's trial counsel regarding his reasons for not calling Smith's mother and brother, the Supreme Court of Nevada reasonably concluded that Smith failed to demonstrate prejudice. It is true, as Smith contends, that his mother's and brother's testimonies would have disputed, at least in part, Aragon's testimony about how Smith obtained the gun and bat used in the crime. Indeed, based on the investigative reports, Smith's mother and brother would have directly contradicted Aragon's testimony that Smith had obtained the gun and baseball bat from their residences. ECF No. 15-1 at 39–45. However, as the Supreme Court of Nevada reasonably concluded, Smith fails to demonstrate a reasonable probability of a different outcome at trial. Smith does not dispute that he brought the baseball bat and gun into James' house, so regardless of whether he obtained those items from his mother and brother before going to James' house or merely had them in his possession already, or some other alternative, Smith made the decision to purposefully take them with him into James' house. The evidence shows that Smith entered James' house with the intent to harm James. Thus, the Supreme Court of Nevada's determination that Smith failed to demonstrate prejudice constituted an objectively reasonable application of *Strickland*'s prejudice prong and was not based on an unreasonable determination of fact. *Strickland*, 466 U.S. at 688, 694. Smith is not entitled to federal habeas relief on ground 2(c).

> ### 5.   *Ground 2(d)—elicit testimony about James' other wounds.*

In ground 2(d), Smith alleges that his trial counsel was ineffective for failing to present evidence—either through cross-examination of Dr. Dutra or through his own expert witness— that (1) James' facial blunt force wounds were consistent with falling to the ground or being

punched rather than being struck with a baseball bat and (2) James' abrasion on his knee was consistent with a struggle. ECF No. 13 at 24. Smith explains that such testimony would have undermined the prosecutor's contention that he acted with premeditation and deliberation. *Id.*

### a.   *State court determination*

In affirming the state court's denial of Smith's state postconviction petition, the Supreme Court of Nevada held:

> Third, Smith argues trial counsel should have challenged the cause of the injuries to the victim's face and other injuries to the victim either through a more rigorous cross-examination of the forensic pathologist or by hiring an expert. Smith has not demonstrated deficient performance or prejudice. Beyond reference to a medical test regarding blunt force injuries, Smith has not presented any specific facts that would entitle him to relief. Contrary to Smith's assertion, trial counsel asked the forensic pathologist whether the injuries could have been caused by a fall. Smith neither identifies what further questions should have been asked nor presents any specific information a defense expert would have offered at trial. Simply stating that there was something further counsel could have done falls short of demonstrating that trial counsel was objectively unreasonable in how they presented the case at trial. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). Further, Smith has not demonstrated a reasonable probability of a different outcome at trial given the substantial evidence presented at trial. Therefore, the district court did not err in denying this claim without an evidentiary hearing.

ECF No. 15-8 at 5–6.

### b.   *Analysis*

During cross-examination, Smith's counsel asked Dr. Dutra whether James' facial "injuries could have been caused by the deceased falling into a hard item with enough velocity." ECF No. 30-2 at 85. Dr. Dutra responded, "[t]hat's possible." *Id.* And when James' counsel asked, "you really can't say one way or the other," Dr. Dutra responded, "I cannot." *Id.* Based on this questioning, it appears that the Supreme Court of Nevada reasonably determined that Smith failed to demonstrate that his trial counsel acted deficiently regarding James' facial wounds. However, regardless of any deficiency regarding Smith's trial counsel's alleged failure to further challenge Dr. Dutra in this regard by way of, for example, citing a medical treatise or journal, the Supreme Court of Nevada reasonably concluded that Smith failed to demonstrate prejudice. Indeed, as the Supreme Court of Nevada reasonably determined, Smith fails to demonstrate a reasonable probability of a different outcome at trial. As was discussed in ground 2(c), because

the evidence at trial demonstrated that Smith took a gun and baseball bat into James' house to confront James about dating Colver, there was overwhelming evidence that Smith entered James' residence with the intent to harm James. As such, the jury could have believed that James' facial and knee injuries were the result of Smith battering James before shooting him, thereby solidifying their first-degree murder verdict. Alternatively, even if the jury believed that James' facial and knee injuries were the result of a fall or struggle with Smith prior to the shooting, given the circumstances regarding Smith's entry into the house with a gun, the jury could have still found Smith guilty of first-degree murder under a felony-murder theory. Accordingly, it is mere speculation that any additional evidence in this regard would have changed the jury's verdict. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."). Therefore, the Supreme Court of Nevada's determination that Smith failed to demonstrate prejudice constituted an objectively reasonable application of *Strickland*'s prejudice prong and was not based on an unreasonable determination of fact. *Strickland*, 466 U.S. at 688, 694. Smith is not entitled to federal habeas relief on ground 2(d).

## C. Ground 3—assistance of appellate counsel

In ground 3, Smith alleges that he was denied the effective assistance of appellate counsel as guaranteed by the Sixth and Fourteenth Amendments because his appellate counsel failed to raise a claim seeking relief for the trial court's improper application of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its failure to overrule the prosecution's discriminatory peremptory strike of a prospective juror. ECF No. 13 at 27.

### 1. *Batson v. Kentucky*

The use of a peremptory challenge to remove a prospective juror because of race violates the federal constitution. *See J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 129 (1994); *Powers v. Ohio*, 499 U.S. 400, 409 (1991). Under *Batson*, 476 U.S. 79 and its progeny, consideration of a defendant's challenge to a peremptory strike involves a three-step analysis:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecution to present a race-neutral explanation for striking the juror in question. . . . Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.

*Rice v. Collins*, 546 U.S. 333, 338 (2006). "[T]he critical question in determining whether a [petitioner] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003). The issue comes down to credibility, and "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339.

### 2.   Background information

Ms. Jackson was a prospective juror. ECF No. 28-8 at 55. When the trial court asked if any of the jurors had "anyone close to [them] . . . who ha[d] been arrested or charged with a crime," Ms. Jackson indicated that she had "a cousin who just was released from federal prison." *Id.* at 67, 74. Ms. Jackson elaborated that her cousin had been convicted of drug trafficking in Houston and that she had written a letter to the judge on her cousin's behalf. *Id.* at 74–75. Ms. Jackson stated that she wrote the letter because of her cousin's horrible upbringing. *Id.* at 75. Then, in response to the trial court's question whether any of the jurors had family members that have worked in law enforcement, Ms. Jackson indicated that her first cousin was a retired policeman from New Orleans. *Id.* at 80.

During the prosecution's voir dire, the prosecutor asked Ms. Jackson about her view of the criminal justice system, and Ms. Jackson answered that she believed it was a fair but imperfect system. *Id.* at 91–92. The prosecutor then asked Ms. Jackson's about her views of law enforcement, and the following colloquy took place:

> PROSPECTIVE JUROR NO. 074: I have had some good situations with cops where -- to the point where most of the times I've gotten pulled over I've gotten away without getting a ticket, but then, you know, and I don't mean to be, you know, racial or anything. I have also had experience with policeman where, you know, I know that they have to have this type of facade, but my experience with them in my particular neighborhood I -- where I came from, this little area in Louisiana, and it's always been negative with them. Everything, I mean, you are guilty, you know, until proven innocent with them, and many times I've had to call because I was being harassed within the neighborhood, but the mentality of this force was everybody goes to jail. There's nobody right in this area. Everybody goes to jail. experiences with them. That's been some of my experiences with them.
> [Prosecutor]: Correct me if I'm wrong, but I think what you just said is kind of the perfect example of in any profession would you not agree that there are good lawyers, bad lawyers, good doctors, bad doctors, and it is the same with law enforcement. Would you agree with that? You are kind of hesitating.

PROSPECTIVE JUROR NO. 074: I do agree with that, but this in this particular neighborhood where, you know, and it wasn't that awful because I also look at the flip side of it. Because of the way those cops were that was one of the safest places to live, okay. So but it's just my personal experiences with them, you know. Like I said, I've had to call, and instead of me being a victim I was offered to go to jail and let the judge decide who's right and who's wrong, which I don't, you know, think that was right.

[Prosecutor]: Okay. Do those experiences, specifically the ones in Louisiana in your neighborhood, do you think that experience has any bearing on, you know, the credibility that you would give to a law enforcement officer or a policeman, you know, who's taking the stand swearing to tell the truth and then giving testimony in this case? Do you think that makes you a little bit more hesitant to believe a police officer's testimony based on your experiences in Louisiana?

PROSPECTIVE JUROR NO. 074: That's a hard one because I've had, you know -- I mean, I'm not a criminal by no means but, you know, I have also had some just because of this lawyer and if I was to say the name of this city, many people would probably, you know, know what I'm talking about, but this is the same force that, you know, sat on top of the bridge and forced people back into the flooded streets of New Orleans. you know what I mean? I am not saying all cops are bad cops, but my experiences with them –

[Prosecutor]: I can tell just based on the way you are speaking about it, your facial expressions, your body language that it left a sour taste in your mouth as far as police officers in Louisiana. I guess my question is more to so does that experience with the Louisiana force that you've been talking about, would that affect your ability to weigh the credibility of a police officer or agent active in this particular case?

PROSPECTIVE JUROR NO. 074: I would definitely weigh it. I would way it severely.

[Prosecutor]: Would you give it more or less weight based on that particular experience?

THE COURT: The question is would you just automatically --

PROSPECTIVE JUROR NO. 074: No, I wouldn't.

THE COURT: -- think one thing or another --

PROSPECTIVE JUROR NO. 074: No, because --

THE COURT: -- or would you keep an open mind and listen, and we want people to think critically and then assess --

PROSPECTIVE JUROR NO. 074: Yes, I would have to hear the facts though.

THE COURT: -- ability to perceive --

PROSPECTIVE JUROR NO. 074: I would definitely have to hear facts, and I will weigh them.

THE COURT: Okay. Let me ask you this: Have you had any positive experiences with law enforcement since you have been here in Clark County whether it be Metro or North Las Vegas PD or Henderson, troopers, anything?

PROSPECTIVE JUROR NO. 074: The one time I've had had - - had to come in contact with them they were very polite, very unlike where I've come from.

THE COURT: And that would've been Metro out here or North Las Vegas?

PROSPECTIVE JUROR NO. 074: One time it was North Las Vegas, and then I was around something that happened with Metro, and they basically, you know, were very professional about it. I mean, no one came at you talking at you as opposed to -- yeah, big difference.

THE COURT: Thank you.

*Id.* at 99–103.

22

Later, Smith's counsel and Ms. Jackson had the following colloquy:

> [Defense counsel]: . . . You had indicated you worked for the district attorney's office in Louisiana where you had a lot of contact with the justice system and police. Any contact with the attorneys out here in Nevada?
> PROSPECTIVE JUROR NO. 074: No.
> [Defense counsel]: Any contacts other than with the district attorney's office when you are back in Louisiana?
> PROSPECTIVE JUROR NO. 074: (Prospective juror shook head.)
> [Defense counsel]: That's a no?
> PROSPECTIVE JUROR NO. 074: Yes.
> [Defense counsel]: While I'm asking you some questions, let me just follow up a little bit on what the district attorney was talking to you about. You told us some information about the way things are in Louisiana or were in Louisiana at certain points in time, correct?
> PROSPECTIVE JUROR NO. 074: Yes.
> [Defense counsel]: And that's all you were talking about is situations in Louisiana?
> PROSPECTIVE JUROR NO. 074: Yeah.
> [Defense counsel]: You don't expect you are going to see anybody from Louisiana come into court and testify in this case, do you?
> PROSPECTIVE JUROR NO. 074: I don't think so.
> [Defense counsel]: There's not going to be any Louisiana police officers to come in to testify, correct?
> PROSPECTIVE JUROR NO. 074: Uh-huh.
> [Defense counsel]: As far as you know?
> PROSPECTIVE JUROR NO. 074: Yes, sir.
> [Defense counsel]: And the one contact you had with law enforcement here in Clark County was a positive contact?
> PROSPECTIVE JUROR NO. 074: Uh-huh.
> [Defense counsel]: Is that yes?
> PROSPECTIVE JUROR NO. 074: Yes, sir.
> [Defense counsel]: And you will judge the testimony of a police officer the same as you would any other witness?
> PROSPECTIVE JUROR NO. 074: Yes, I would.
> [Defense counsel]: And there is nothing about what happened in the past in your life in Louisiana that would affect your ability to hear this case?
> PROSPECTIVE JUROR NO. 074: No, it wouldn't.

*Id.* at 135–36.

The prosecution used a peremptory challenge to excuse Ms. Jackson. *Id.* at 158.

Following jury selection, outside the presence of the jury, the trial court asked the parties if there was anything they wanted to put on the record because the bench conferences had not been recorded. ECF No. 29-1 at 76. The trial court then explained that "[t]he State exercised a peremptory challenge to excuse" a woman, Ms. Jackson, who "was an African-American juror." *Id.* at 77. The following colloquy then occurred:

> [Defense counsel]: We did express a Batson objection, Your Honor, even though it was the first juror because in our experience once you get to the second one it's too late to go back and revisit the first. The State did provide race-neutral

reasons to the Court. I don't know if the Court wants them to repeat those at this point to make a complete record.

THE COURT: Well, we haven't established a pattern because I believe there were two African Americans as I recall. They challenged one. They left the other African American on the jury; however, to make - - so I don't see that there's any kind of pattern of them excluding African Americans or any other ethnic or racial group.

However, to make a more completed record, [prosecutor], would you state your race neutral reason on the record?

[Prosecutor]:  Yes, thank you, Your Honor.

The State had concerns about Ms. Jackson. In particular she said in questioning about assessing police officers, she said it would be hard to say if she could be fair to police officers. [The other prosecutor] continued to ask questions, and one direct quote that I wrote down was Ms. Jackson said, I would weigh it - - meaning the testimony of a police officer - - severely. That gave the State great concern.

In addition, she indicated she wrote a letter to a judge on behalf of one of her family members who - - as I understood it - - went to prison, and she said that she felt that she needed to write that because of the family member's upbringing.

So those were all reasons that are separate and distinct from anything to do with her race, and in fact, I think this is the most difficult thing we do here as far as these Batson challenges is how we try to assess whether someone is of a particular race.

The Court is very accurate in the fact that Mr. Griffith, Seat No. 1 is - - as I see - - an African American. The State did not exercise a challenge.

This challenge on Ms. Jackson was the very first one. So as you pointed out there was not a pattern, and I would also indicate seated in No. 13 is Mr. Sosa. I don't know exactly what ethnicity Mr. Sosa is. I would dare say he is not Caucasian, and so I think that's another example of another individual that we have not exercised a peremtive [sic] challenge on. I think he could be African American, and we have kept him on the jury as well.

THE COURT: And that is the difficulty. I always say you can't tell if people are racially mixed. He appears to be Hispanic, but whether he's Hispanic, African Hispanic or Caucasian Hispanic, Indian Hispanic or a mixture of all of the above or even Asian Hispanic. Because there apparently were a number of Asians who were brought to Latin America to work. So you could be a mixture of all of those things.

*Id.* at 77–79.

Later, after the parties settled jury instructions, the trial court put the following findings on the record regarding Ms. Jackson: "I made a finding that A, there hadn't been a pattern or practice because it was just one, and second of all, you had stated some race-neutral reasons." ECF No. 31-1 at 127. The prosecutor then asked, "[s]o the defendant did not demonstrate purposeful discrimination." *Id.* And the trial court answered, "[n]o." *Id.*

24

### 3.   State court determination

In affirming the state court's denial of Smith's state postconviction petition, the Supreme Court of Nevada held:

> Fifth, Smith argues that his appellate counsel should have raised a claim based on *Batson v. Kentucky*, 476 U.S. 79 (1986). To prove ineffective assistance of appellate counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that the omitted issue would have had a reasonable probability of success on appeal. *Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). As stated earlier, both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697.
>
> Smith argues the trial court did not engage in a sincere and reasoned effort to evaluate the circumstances of the *Batson* challenge and incorrectly determined that the challenge lacked merit because there was only one African-American veniremember struck. Smith further complains that the trial court would not let the parties make a record of the *Batson* challenge after the trial had begun. Smith has not demonstrated deficient performance or prejudice. After trial counsel made a claim of prima facie discrimination based on the State's challenge to one or two African-American veniremembers, the State provided a race-neutral explanation, which included the veniremember's response that she would find it difficult to be fair to police officers and that she had written a letter to a judge about a family member's incarceration. The trial court accepted the State's reasons and rejected the challenge. Although the court's comments on the record about the unrecorded bench conference were summary, Smith has not demonstrated purposeful discrimination such that a *Batson* challenge would have succeeded on appeal. *See Cooper v. State*, 134 Nev. 860, 861, 432 P.3d 202, 204 (2018) (setting forth the three steps in a *Batson* challenge and recognizing that the third step involves a determination of whether the opponent of the peremptory strike has shown purposeful discrimination). In particular, Smith has not shown that the prosecutor engaged in disparate questioning; that similar answers were given by jurors who were not struck, especially considering the number of issues that arose from the questions answered by the struck veniremember; or any historical discrimination in the use of peremptory challenges. *See Ford v. State*, 122 Nev. 398, 405, 132 P.3d 574, 578–79 (2006) (discussing possible reasons for finding the explanation for a challenged strike to be pretextual). The trial court's comment regarding there being only one African-American veniremember struck, in context, went to step one of the *Batson* analysis, which was a moot point after the State offered a race-neutral explanation. *See Cooper*, 134 Nev. at 862, 432 P.3d at 205 (noting that a pattern of peremptory strikes is one way to satisfy step one of a *Batson* challenge requiring a prima facie showing that the strike was race-based); *Williams v. State*, 134 Nev. 687, 690–91, 429 P.3d 301, 306–07 (recognizing that step one of a *Batson* challenge is moot when the State offers a race-neutral explanation); *Watson v. State*, 130 Nev. 764, 776, 335 P.3d 157, 166 (2014) ("[T]he mere fact that the State used a peremptory challenge to exclude a member of a cognizable group is not, standing alone, sufficient to establish a prima facie case of discrimination under *Batson*'s first step . . . ."). Smith further does not demonstrate the court erred in refusing to allow the State to make a second record during trial. Under these circumstances, it was not objectively unreasonable for appellate counsel to omit this claim, and Smith has not demonstrated that a *Batson* claim had a reasonable probability of success on appeal. Therefore, we conclude that the district court did not err in denying this claim without an evidentiary hearing.

ECF No. 15-8 at 7–8.

### 4.   *Analysis*

The *Strickland* standard discussed above is also utilized to review appellate counsel's actions: a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). To determine whether Smith's appellate counsel's failure to raise a *Batson* claim on direct appeal was objectively unreasonable and prejudicial, the court must first assess the merits of the *Batson* claim. *See Moormann v. Ryan*, 628 F.3d 1102, 1106–07 (9th Cir. 2010); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal."); *Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir.1997) ("A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court.").

As the Supreme Court of Nevada reasonably determined, in accordance with the three-step process under *Batson*, Smith's trial counsel made a claim of prima facie discrimination based on the prosecution's challenge to Ms. Jackson, the prosecution provided a race-neutral explanation for using a preemptory challenge on Ms. Jackson, and the trial court rejected the challenge, finding that Smith did not demonstrate purposeful discrimination. Smith contends that the trial court merely accepted the prosecution's reasoning in step three without evaluating the discrimination claim, assessing the prosecution's reasoning, or conducting any analysis. ECF No. 90 at 69. As the Supreme Court of Nevada reasonably noted, the three-step *Batson* process took place during an unrecorded bench conference and was then only repeated in summary fashion on the record. Consequently, although the trial court's on-the-record *Batson* framework was perfunctory, the Supreme Court of Nevada reasonably concluded that a *Batson* process challenge would not have succeeded on appeal given the lack of information that the process was inadequate.

Smith also contends that the trial court erroneously concluded that the prosecution had not purposefully discriminated when it struck Ms. Jackson because the prosecution's stated grounds were pretextual. ECF No. 90 at 69. Although Ms. Jackson gave several answers during voir dire demonstrating that she could be a fair and impartial juror, Ms. Jackson also gave answers demonstrating that she possessed at least mild pro-defendant and mild anti-law enforcement perspectives: (1) she indicated that she wrote a letter to a judge on behalf of her cousin who was in federal prison, and (2) she only had negative experiences with police officers in Louisiana where she previously lived. Further, during her discussion with Ms. Jackson, the prosecutor stated that she could "tell just based on the way [Ms. Jackson was] speaking about it, [her] facial expressions, [her] body language" that her experiences with police in Louisiana "left a sour taste in [her] mouth." ECF No. 28-8 at 101. The prosecutor then asked whether Ms. Jackson's experience with Louisiana police officers would affect her "ability to weigh the credibility of a police officer." *Id.* Ms. Jackson responded that she "would definitely weigh it. [She] would way it severely." *Id.* at 102. Although Ms. Jackson later clarified that she would weigh the testimony of a police officer the same as any other witness, her "severely" answer was at least mildly confusing and potentially problematic for the prosecution. And although Ms. Jackson stated that she had had positive experiences with police in Clark County, it is understandable that the prosecution would be concerned with her troublesome foundational views of police from her time living in Louisiana.

In sum, because Smith fails to demonstrate that a *Batson* process claim or a purposeful discrimination claim would have succeeded on appeal, the Supreme Court of Nevada reasonably determined that Smith failed to demonstrate that his appellate counsel was ineffective for not including these claims in his direct appeal. Thus, because the Supreme Court of Nevada's rejection of this claim constituted an objectively reasonable application of *Strickland* and was not based on an unreasonable determination of fact, Smith is not entitled to federal habeas relief on ground 3.

### D.   Ground 4—cumulative error

In ground 4, Smith alleges that cumulative error. ECF No. 13 at 31. On direct appeal, the Supreme Court of Nevada determined that "[b]ecause the district court did not err, there is no cumulative error." ECF No. 33-10 at 8, n.5. And in affirming the state court's denial of Smith's state postconviction petition, the Supreme Court of Nevada determined that "Smith has not demonstrated counsel's performance was deficient, [so] there is nothing to cumulate." ECF No. 15-8 at 9. Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Supreme Court of Nevada reasonably denied Smith relief on his cumulative error claims because there were no errors to cumulate. Smith is not entitled to federal habeas relief on ground 4.

## IV.   Certificate of Appealability

This is a final order adverse to Smith. Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). I have *sua sponte* evaluated the claims within the amended petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying these standards, I find that a certificate of appealability is unwarranted.

V.      **Conclusion**[6]

I THEREFORE ORDER that the amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 **[ECF No. 13] is denied**.

I FURTHER ORDER that a certificate of appealability is denied.

I FURTHER ORDER that the Clerk of Court (1) substitute Ronald Oliver for Respondent Jerry Howell, (2) enter judgment accordingly, and (3) close this case.

Dated: January 22, 2024

_____
UNITED STATES DISTRICT JUDGE

---

[6] Smith requests that this court conduct an evidentiary hearing. ECF No. 13 at 32. I decline to do so because I am able to decide the petition on the pleadings.